HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ALICIA SWEARINGEN and DAVID SWEARINGEN, on their own behalf and on behalf of their minor child, L.S.,<br><br>Plaintiff,<br><br>v.<br><br>NORTH THURSTON SCHOOL DISTRICT,<br><br>Defendant. | CASE NO. 3:18-cv-05727-RBL<br><br>ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>DKT. # 24 |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiffs Alicia and David Swearingen's Motion for Partial Summary Judgment. Dkt. # 24. The Swearingens' son, L.S., attempted to commit suicide on October 11, 2017 by jumping off the second-floor railing of Salish Middle School. About six months before this incident, L.S. reported to Salish's school counselor that he had considered hurting himself in exactly this way, although he changed his mind and did not report similar intentions again. The school did not create a formal safety plan for L.S., who continued to struggle socially. Now, the Swearingens have asserted several claims against Defendant North Thurston School District, including negligence based on the school's failure to adequately

1  respond to L.S.'s report of suicidal ideation. The Swearingens' Motion for Summary Judgment

2  addresses only this claim. For the following reasons, the Court DENIES the Swearingens'

3  Motion.

4  **BACKGROUND**

5       L.S. is the 16-year-old son of Alicia and David Swearingen. At a young age, L.S. was

6  diagnosed with autism, ADHD, and bipolar disorder. The Swearingens struggled to deal with the

7  impact of L.S.'s diagnoses while he was growing up. L.S.'s behavioral issues included lying,

8  threats, and problems with impulse control. When he was five or six, L.S. became incensed when

9  some of his female classmates tried to block him out at lunch, causing L.S. to rip up their school

10  work, tip over a table, and kick the teacher that tried to intervene. When he was nine, he was

11  admitted to an inpatient facility for, among other things, trying to choke his mother and

12  threatening her with a butcher knife that he later turned on himself. Seattle Children's Mental

13  Health Eval., Dkt. # 30-5.

14       After he was discharged, L.S. continued to see a psychologist for regular counseling once

15  a month between October 2013 through May 2014. For some time after that, L.S. did not have

16  regular counseling but did see a psychiatrist every four months or so for medication

17  management. In May 2016, Mrs. Swearingen reported to L.S.'s psychiatrist that his mood and

18  outbursts were worsening and requested re-trying ADHD medication. L.S. was prescribed a trial

19  of Concerta, but Mrs. Swearingen reported that L.S.'s issues were persisting. The notes from

20  L.S.'s September 18, 2017 visit to his psychiatrist indicate that the "family may try off Concerta,

21  but will provide backup rx." Penner Notes, Dkt. # 30-11.

22       Meanwhile, L.S. was attending Salish Middle School in the North Thurston School

23  District. Leading up to his suicide attempt on October 11, 2017, L.S. experienced several

24

documented incidents of conflict and harassment with other students at the end of his seventh-grade year and the beginning of his eighth-grade year. One occurred around April 20, 2017, when L.S. reported to Salish's counselor, Renee Bert, that other students had been writing things about him on the white board in his advisory class. The messages included "suck it," "fuck you," and "KYS," which stands for "kill yourself." Bert Notes, Dkt. # 25-7, at 3. Bert's notes from L.S.'s April 20 counselling session contain other troubling information, including that L.S. would not do his math homework, felt hated, had given up on making friends, and had been cutting himself recently. *Id*. at 3-4. Evidence shows that Bert was aware that L.S. had cut himself in the past. Dkt. # 36-2 at 132-33.

L.S. also disclosed to Bert that he had told another student he wanted to "jump off the railing" and "would do it," but the other student talked him out of it. *Id*. at 4. Bert asked L.S. to rate the seriousness of this suicide plan, and L.S. responded that it was an 8 the day before but a 1 or 2 on the day of the counseling session. *Id*.; Bert Dep., Dkt. # 25-5, at 198. According to Bert's notes and her deposition, L.S. had "no plan" to hurt himself that day because of all the people that loved him. Bert notes at 4; Bert Dep. at 198. Bert testified that she disclosed all this to Mrs. Swearingen on a phone call, but Mrs. Swearingen disputes this. *Id*.; Alicia Swearingen Dep., Dkt. # 30-2, at 11. Bert did, however, email Mrs. Swearingen a couple days later with a list of potential therapists for L.S. Dkt. # 30-13.

1   Bert's description of her reaction to L.S.'s report of suicidal ideation is muddled. Bert
2   remembers discussing L.S.'s 8-out-of-ten assessment of intent with the school psychologist,
3   L.S.'s case manager, and the assistant principal. Bert Dep. at 158. She also wrote down a "plan"
4   for L.S. in her notes that looked like this:



Dkt. # 25-7 at 4. Bert maintains that her colleagues knew about this plan but is hazy about whether she actually showed it to them. Bert Dep. at 157-58. Based on Bert's notes and her deposition, the plan to respond to L.S.'s suicidal ideation consisted mostly of keeping tabs on him, communicating frequently, and ensuring that he felt cared for and supported by the adults at the school. *Id*.

Despite L.S.'s description of a specific plan for hurting himself the day before, which Bert described as "red-flag serious," Bert did not complete any kind of formal risk assessment on L.S. beyond asking him to self-assess his intentions on a one-to-ten scale. Bert Dep. at 145, 149-50. Rather, because L.S. had rated himself a 1 or 2 on April 20, Bert decided that L.S. was "low-risk" and that filling out the safety plan available for students who were in severe distress was "not necessary." *Id*. at 147-49.

Bert also did not follow the school's policy under RCW 28A.300.285 for handling incidents of harassment, intimidation, or bullying (HIB). Bert Dep. at 125-26. Just a month before L.S.'s April 20 session, Bert had attended a training session on the policy that defined

1  HIB and provided instructions on appropriate response. HIB Presentation, Dkt. # 25-14. If a
2  student has an individualized education plan (IEP), as L.S. did, then any HIB incident requires a
3  meeting with the students' IEP team to discuss whether the incident affected the student's right
4  to receive a free appropriate public education. *Id*. at 6. The policy also includes a general process
5  of reporting using a particular form, resolving incidents, investigating, and instituting corrective
6  measures. *Id*. at 9-16.

7        The last two entries in Bert's notes from L.S.'s seventh-grade year contain nothing
8  similar to the April 20 session. Bert Notes at 7. However, when L.S. returned for eighth grade, he
9  continued to struggle with other students. On September 8, 2017, L.S. got into an altercation in
10 the cafeteria. L.S. recounts that another student that had been bullying him since fifth grade
11 would not let him sit down. L.S. Dep., Dkt. # 25-2, at 66, 75. Salish's assistant principal, Casey
12 Wyatt, observed the incident and testifies that L.S. took the seat of another student who had
13 gotten up and that the other student pushed L.S. out of the seat when he refused to move. Wyatt
14 Dep., Dkt. # 30-20, at 102-03. The other student then started criticizing L.S. to someone else and
15 L.S. reacted by punching him in the head. *Id*. at 103. On September 20, an email from one of
16 L.S.'s teachers to Bert states that L.S. was having a "hard day" and was feeling tired, did not like
17 the food at lunch, and was having trouble in math class. Dkt. # 25-8.

18       On September 27, 2017, L.S. had an altercation at the bus stop. According to Bert's notes
19 and L.S.'s deposition, this student had been taunting L.S. earlier that day and trying to fight him,
20 but L.S. declined. Bert Notes at 11; L.S. Dep. at 87. L.S. recounts that the other student then tried
21 to stab him with a pencil at the bus stop but was disarmed by one of L.S.'s friends. L.S. Dep. at
22 87. L.S. then pulled the other student to the ground and the two were separated. *Id*. There is a
23 video of the incident that roughly tracks with this account. Dkt. # 25-14. Bert's notes indicate
24

1   that L.S. may have been upset that his account of the incident was not believed and wanted the

2   other student punished, which he apparently was. Bert Notes at 12; Wyatt Dep. at 118. However,

3   Bert's notes show that on October 3 L.S. still did not feel safe because of this altercation. Bert

4   Notes at 13.

5   On October 4, 2017, a teacher reported to Bert that L.S. had moved his desk apart during

6   class, put his head down, and started crying. Bert Dep. at 241; Bert Notes at 15. When asked

7   what was wrong, L.S. said that another student had been bullying him and calling him

8   "annoying." Bert Dep. at 241; Bert Notes at 16. Bert and the teacher decided to have a

9   "mediation" with L.S. and the other student to resolve their conflict. Bert Dep. at 244-45. Bert's

10  notes also indicate that she called L.S.'s mother and contacted L.S.'s psychiatrist about "how to

11  help him with peer perception." Bert Notes at 13-14.

12  On October 11, 2017, L.S. attempted suicide by jumping off Salish Middle School's

13  second-floor railing. Video, Dkt. # 25-4. He had a note in his pocket that read "I'm so sorry."

14  Note, Dkt. # 25-16. When asked about why he jumped, L.S. testified that he "felt like nobody

15  really cared about [him] at the school." L.S. Dep. at 110. L.S. sustained serious injuries and was

16  hospitalized for about 17 days after the incident.

17  **DISCUSSION**

18  **1.      Summary Judgment Standard**

19  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

20  file, and any affidavits show that there is no genuine issue as to any material fact and that the

21  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

22  an issue of fact exists, the Court must view all evidence in the light most favorable to the

23  nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty*

24

1  *Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

2  A genuine issue of material fact exists where there is sufficient evidence for a reasonable

3  factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether

4  the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

5  one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

6  **2.   Negligence**

7  The Swearingens' Motion for Summary judgment focuses solely on their negligence

8  claim. In Washington State, the elements of a negligence action are duty, breach, proximate

9  causation, and damages. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wash. 2d 468, 474 (1998)

10 (citing *Pedroza v. Bryant*, 101 Wash.2d 226, 228, 677 P.2d 166 (1984)). The element of

11 proximate causation further breaks down into cause-in-fact and legal cause. *Id*. (citing *Petersen*

12 *v. State*, 100 Wash.2d 421, 435 (1983)).

13 Although there is no general duty to affirmatively prevent harm, such a duty may arise

14 when there is a special relationship between the defendant and the victim. *N.K. v. Corp. of*

15 *Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 175 Wash. App. 517, 525

16 (2013). Washington courts recognize a special relationship between schools and their students

17 due to the control exerted by the former over the latter. *Hendrickson v. Moses Lake Sch. Dist.*,

18 192 Wash. 2d 269, 276 (2018). Courts reason that this control causes a corresponding loss of the

19 student's ability to protect himself or herself. *Church of Jesus Christ of Latter-Day Saints*, 175

20 Wash. App. at 532 (citing *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wash. 2d 217, 228 (1991)).

21 "As a result, the school district must 'take certain precautions to protect the pupils in its

22 custody from dangers reasonably to be anticipated.'" *Id*. (quoting *McLeod v. Grant County*

23 *School District No. 128*, 42 Wash.2d 316, 320 (1953)). The scope of a school's duty

24

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 7

encompasses a "general field of danger" that is "reasonably foreseeable." *Hendrickson*, 192 Wash. 2d at 276 (citing *McLeod*, 42 Wash. 2d at 321). While schools must only exercise "ordinary, reasonable care" to protect students, the special custodial relationship covers a "larger pool of risk" than the typical duty to protect against threats within a person's direct control. *Id*. at 277. The duty extends even to harm caused by third parties. *Id*.

Courts have identified a variety of threats that can trigger a school's duty to act. In *McLeod*, the Court held that one student's rape of another in a dark, out-of-the-way room beneath the bleachers was not unforeseeable as a matter of law. 42 Wash. 2d at 323. Harassment and bullying by other students can also fall within the scope of a school's duty. *Quynn v. Bellevue Sch. Dist.*, 195 Wash. App. 627, 638 (2016). While Washington courts have not specifically addressed self-harm by students, other courts have. In *Eisel v. Board of Education of Montgomery County*, for example, Maryland's supreme court concluded that "school counselors have a duty to use reasonable means to attempt to prevent a suicide when they are on notice of a child or adolescent student's suicidal intent." 324 Md. 376, 393 (1991); *see also Dzung Duy Nguyen v. Massachusetts Inst. of Tech.*, 479 Mass. 436, 453 (2018) (holding that universities have a duty to take reasonable measures to prevent student suicide in certain situations).

Washington courts divide the analysis of duty into two parts. On one hand, "[w]hether a duty exists is a question of law for the court." *Bethel School District*, 186 Wash. 2d at 436. Thus, in *Bethel School District*, the Supreme Court held as a matter of law that a school's duty can encompass protecting against off-campus injuries. *Id*. On the other hand, "[t]he concept of foreseeability limits the scope of the duty owed," and "[f]oreseeability is normally an issue for the jury." *Christen v. Lee*, 113 Wash. 2d 479, 492 (1989); *see also L.S. v. Tacoma Sch. Dist.*, No. 3:13-CV-5240-RBL, 2014 WL 1569280, at *5 (W.D. Wash. Apr. 18, 2014) (Leighton, J.) (citing

*Christen*). For this reason, *Bethel School District* did not take the further step of determining whether the particular injury before the Court fell within the scope of the school's duty, explaining that this was "properly a question for the jury." 186 Wash. 2d at 436. In short, courts must define the contours of the duty between the parties but should not rule on whether it encompasses a specific injury unless the undisputed facts leave no room for "reasonable difference of opinion." *McLeod*, 42 Wash. 2d at 323.

Here, the Swearingens argue not only that suicide is within the scope of a school's protective duties, but also that L.S.'s suicide attempt in particular was a foreseeable risk. The Swearingens assert that L.S.'s diagnosed conditions, history of cutting himself, social struggles, and specific description of his plan to jump off the second-floor railing made his eventual decision to do so foreseeable. While North Thurston appears to concede that it owed L.S. a duty based on the school/student relationship, it asserts that reasonable minds could disagree about whether L.S.'s suicide attempt was foreseeable. According to North Thurston, the six-month gap between L.S.'s report of suicidal ideation and his attempt, as well as L.S.'s fluctuating account of how serious his intentions were, preclude summary judgment.

The Swearingens are correct that, because the alleged negligence occurred while L.S. was in the school's custody, North Thurston had a duty to protect L.S. from foreseeable harm. *See Bethel Sch. Dist.*, 186 Wash. 2d at 435 ("[T]he relevant inquiry is to the location of the negligence."). The Swearingens are also correct that L.S.'s suicide attempt is potentially within the broad "pool of risk" that schools may be required to anticipate. *See Hendrickson*, 192 Wash. 2d at 277. Liability for self-harm is consistent with the underlying policy rationale for the student/school special relationship. When a parent sends their child to school, they lose the ability to monitor the child's mental health and thwart dangerous impulses. The school

environment itself, which students are forced to inhabit, can also contribute to the mental health struggles that lead to suicide. Just as a school should protect students from each other, it should also protect students from themselves.

But while a duty *exists*, the Court cannot conclude that L.S.'s suicide attempt was necessarily within its scope. Although L.S.'s description of his suicidal ideation in April was specific, nearly six months passed before L.S. jumped from the second floor in October. During this time, there is no evidence of L.S. mentioning self-harm, serious depression, or other emotional problems similar to what he described on April 20, 2017. Depending on the circumstances, a student's expression of suicidal ideation may make suicide foreseeable months or even years afterward. But the Swearingens' contention that "foreseeability is not a quantifiable inquiry" cuts both ways. Reply, Dkt. # 35, at 4. No Washington court has held that suicide is categorically foreseeable six months after a student expresses ideation. At some point, enough time and intervening events transform a formerly foreseeable act into something unforeseeable. Where that point lies in this case is a question for the jury.

Factual disputes and ambiguities further hinder summary judgment. It is clear that L.S. continued to struggle socially in eighth grade, but the incidents between him and other students are not straightforward. The Swearingens' account paints these altercations as one-sided bullying of L.S., but the evidence does not uniformly support that. According to Wyatt, L.S. was the main aggressor in at least one incident. And there is little evidence regarding the incident that caused L.S. to start crying in class, which took place just days before his suicide attempt.

Duty's foreseeability requirement also overlaps with the contested element of legal causation in a troublesome way. "[T]he issues regarding whether duty and legal causation exist are intertwined." *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wash. 2d 468, 479 (1998). Indeed,

some courts have described them as coextensive. *Taggart v. State*, 118 Wash. 2d 195, 226 (1992); *Hartley v. State*, 103 Wash. 2d 768, 781 (1985). In both cases, "[p]olicy considerations and common sense dictate whether the connection of the [defendant] with the [plaintiff's injury] is too remote or insubstantial to impose liability." *Hartley*, 103 Wash. 2d at 781.

North Thurston contends that the notes of L.S.'s psychiatrist indicate L.S. may have been taken off his ADHD medication, Concerta, shortly before his suicide attempt. That medication helped treat L.S.'s impulsive behavior and, according to North Thurston, taking him off it could have been a superseding/intervening cause of his suicide attempt. Kwon Report, Dkt. # 30-26. The Swearingens do not present evidence showing whether L.S. had recently changed his medication, instead arguing that L.S. was on several other medications that also treated impulsiveness. But the Court cannot resolve this issue while such factual ambiguity remains.

This outcome in no way suggests that L.S.'s decision to eventually "jump off the railing," just as he had considered doing before, was *not* foreseeable. Indeed, numerous factors suggest that it very well may have been. But "[f]oreseeability is normally an issue for the jury." *Tacoma Sch. Dist.*, 2014 WL 1569280, at *5. Viewed in the light most favorable to North Thurston, the facts of this case do not allow the Court to hold that L.S.'s suicide attempt was indisputably foreseeable and thus fell within the scope of North Thurston's duty. The Swearingens' negligence claim therefore cannot be resolved on summary judgment.

## CONCLUSION

For these reasons, the Court DENIES the Swearingens' Motion for Partial Summary Judgment.

IT IS SO ORDERED.

1     Dated this 7th day of May, 2020.

*Ronald B. Leighton*
Ronald B. Leighton
United States District Judge